NO.
12-06-00181-CV

 

IN THE COURT OF APPEALS 

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

THE STATE OF TEXAS     §                      APPEAL FROM THE 

 

FOR THE BEST INTEREST          §                      COUNTY COURT AT LAW

 

AND PROTECTION OF
J.H.         §                      CHEROKEE COUNTY, TEXAS

                                                                                                                                                           


MEMORANDUM OPINION

            J.H. appeals
from an order for extended inpatient mental health services and an order for
administration of psychoactive medication. In three issues, J.H. asserts that
the evidence is legally and factually insufficient to support the order for
extended inpatient mental health services, that the trial court erred in
allowing the State to present evidence of acts committed by J.H., and that the
trial court erred in granting the State’s application for an order to
administer psychoactive medication because the order for extended inpatient
mental health services is invalid.  We
affirm.

 

Background








            On
April 25, 2006, Dr. Harry Thompson signed an application for an order to
administer psychoactive medication to J.H. 
Thompson stated that J.H. had been diagnosed with schizophrenia,
paranoid type, continuous with prominent negative symptoms and requested the
trial court to compel J.H. to take nine psychoactive medications: two
anxoilytics/sedatives/hypnotics, six antipsychotics, and a mood
stabilizer.  Thompson stated that J.H.
had often suddenly stopped taking several medicines.  In Thompson’s opinion, J.H. lacked the
capacity to make a decision regarding administration of psychoactive
medications because he attributed delusional “reasons” for the pattern of
sudden abrupt refusals to take medications, such as insisting that an
endocrinologist he was referred to for diabetes told him not to take the
medications. 

            Thompson
concluded that these medications were the proper course of treatment for J.H.
and that, if he were treated with the medications, his prognosis was fair if
recent initiation of Fazaclo[1] was effective, but stated that J.H.
had responded poorly to more than twenty years of continuous treatment. However,
Thompson believed that if J.H. were not administered the medications, the
consequences would be a persistence of his schizophrenic psychosis, continued
hospitalization, and increased risk of aggression as he acts on the paranoid
delusions.  Thompson considered other
medical alternatives to psychoactive medication, but determined that those
alternatives would not be as effective. Moreover, Thompson believed the
benefits of the psychoactive medications outweighed the risks in relation to
present medical treatment and J.H.’s best interest.

            On
April 27, 2006, Elmer Stewart, a social worker at Rusk State Hospital (the “Hospital”),
filed a revised application for court ordered extended mental health services
requesting the trial court to commit J.H. to the Hospital for a period not to
exceed twelve months.  At the time the
application was filed, J.H. was a patient at the Hospital.  A trial on the State’s application was held
on May 26, 2006.  After the trial, the
jury found that J.H. was mentally ill, was likely to cause serious harm to
others as a result of that mental illness, and was suffering severe and
abnormal mental, emotional, or physical distress, was experiencing substantial
mental or physical deterioration of his ability to function independently, that
was exhibited by his inability, except for reasons of indigence, to provide for
his basic needs, including food, clothing, health or safety, and was unable to
make a rational and informed decision as to whether or not to submit to
treatment.  Further, the jury found that
J.H.’s condition was expected to continue for more than ninety days.  On May 26, the trial court entered an order
for extended inpatient mental health services, committing J.H. to the Hospital
for a period not to exceed twelve months. 

            On
the same date, the trial court conducted a hearing on the application to
administer psychoactive medications.  On
May 26, after considering all the evidence, including the application and the
expert testimony, the trial court found that the allegations in the application
were true and correct and supported by clear and convincing evidence.  Further, the trial court found that treatment
with the proposed medication was in the best interest of J.H. and that J.H.
lacked the capacity to make a decision regarding administration of the
medication.  Thus, the trial court
entered an order authorizing the Texas Department of Mental Health and Mental
Retardation (the “Department”) to treat J.H. with psychoactive medications,
including antipsychotics, mood stabilizers, and
anxiolytics/sedatives/hypnotics.  This
appeal followed.

 

Sufficiency
of the Evidence

            In
his first issue, J.H. argues that the evidence is neither legally nor factually
sufficient to support the order of commitment.

Standard of Review

            In
a legal sufficiency review where the burden of proof is clear and convincing
evidence, we must look at all the evidence in the light most favorable to the
finding to determine whether a reasonable trier of fact could have formed a
firm belief or conviction that its findings were true.  In re J.F.C., 96 S.W.3d 256,
266 (Tex. 2002).  We must assume that the
fact finder settled disputed facts in favor of its finding if a reasonable fact
finder could do so and disregard all evidence that a reasonable fact finder could
have disbelieved or found incredible.  Id.  This does not mean that we are required to
ignore all evidence not supporting the finding because that might bias a clear
and convincing analysis.  Id. 

            The
appropriate standard for reviewing a factual sufficiency challenge is whether
the evidence is such that a fact finder could reasonably form a firm belief or
conviction about the truth of the petitioner’s allegations.  In re C.H., 89 S.W.3d 17, 25
(Tex. 2002).  In determining whether the
fact finder has met this standard, we consider all the evidence in the record,
both that in support of and contrary to the trial court’s findings.  Id. at 27-29.  Further, we must consider whether disputed
evidence is such that a reasonable fact finder could not have reconciled that
disputed evidence in favor of its finding. 
In re J.F.C., 96 S.W.3d at 266.  If the disputed evidence is so significant
that a fact finder could not reasonably have formed a firm belief or
conviction, then the evidence is factually insufficient.  Id.  

Extended Involuntary Commitment Order

            The
trial judge may order a proposed patient to receive court ordered extended
inpatient mental health services only if the jury, or the judge if the right to
a jury is waived, finds, from clear and convincing evidence, that (1) the
proposed patient is mentally ill; (2) as a result of that mental illness, he
(A) is likely to cause serious harm to himself, (B) is likely to cause serious
harm to others, or (C) is (i) suffering severe and abnormal mental, emotional,
or physical distress, (ii) experiencing substantial mental or physical
deterioration of his ability to function independently, which is exhibited by
his inability, except for reasons of indigence, to provide for his basic needs,
including food, clothing, health, or safety, and (iii) unable to make a
rational and informed decision as to whether or not to submit to treatment; (3)
his condition is expected to continue for more than ninety days; and (4) he has
received court ordered inpatient mental health services under Subtitle C, Texas
Mental Health Code, or under Chapter 46B, Code of Criminal Procedure, for at
least sixty consecutive days during the preceding twelve months. Tex. Health & Safety Code Ann. §
574.035(a) (Vernon Supp. 2006). 

            To
be clear and convincing under this statute, the evidence must include expert
testimony and evidence of a recent overt act or a continuing pattern of
behavior that tends to confirm either the likelihood of serious harm to the
proposed patient or others or the proposed patient’s distress and the
deterioration of his ability to function. 
Id. § 574.035(e). 
Clear and convincing evidence means the measure or degree of proof that
will produce in the mind of the trier of fact a firm belief or conviction as to
the truth of the allegations sought to be established.  State v. Addington, 588 S.W.2d 569,
570 (Tex. 1979).  The statutory
requirements for an involuntary commitment are strict because it is a drastic
measure.  In re C.O., 65
S.W.3d 175, 182 (Tex. App.–Tyler 2001, no pet.). 

Analysis

            First,
J.H. argues that the trial court failed to find, by clear and convincing
evidence, two criteria necessary to commit him. 
He contends that the order for extended inpatient mental health services
did not include a finding that his condition was expected to continue for more
than ninety days.  See Tex. Health & Safety Code Ann. §
574.035(a)(3).  However, the statute does
not specify that the order must contain this finding, only that the jury make
this finding from clear and convincing evidence.  See id.  The jury made the required finding.  J.H. further contends that the order did not
include a finding that he received court ordered inpatient mental health
services under subtitle C, Texas Mental Health Code, or under Chapter 46B, Code
of Criminal Procedure, for at least sixty consecutive days during the preceding
twelve months.  See id.
§ 574.035(a)(4).  Again, the statute does
not specify that the order must contain this finding, only that the jury must
make this finding from clear and convincing evidence.  See id.  Moreover, the jury is not required to make
this finding if the proposed patient has already been subject to an order for
extended mental health services.  See id.
§ 574.035(d).  During trial, the
trial court took judicial notice that there was an order for extended inpatient
mental health services dated April 26, 2005. 
Thus, the jury was not required to make this finding.  See id. 

            J.H.
further argues that there was insufficient evidence of an overt act or pattern
of behavior that tended to confirm the likelihood of his causing serious harm
to others. At trial, Dr. Rudolfo H. Rodriguez, a ward psychiatrist at the
Hospital, testified that he completed a physician’s certificate of medical
examination for mental illness regarding J.H. on May 1, 2006, and conducted a
medical examination for mental illness. 
Rodriguez determined that J.H. suffered from schizophrenia, paranoid
type.  He stated that J.H.’s mental
illness seemed to be longstanding and that the symptoms were refractory, or not
completely alleviated even with the current medications or treatment.  Although most patients respond quite well to
medications for schizophrenia, patients who do not are usually treated with
Clozaril.  J.H. was being treated with
Clozaril and Seraquel.  According to
Rodriguez, a patient must take Clozaril for about one year before showing
beneficial effects and  J.H. had been
taking Clozaril for about two months. 
When Rodriguez saw J.H. on the day before trial, he was disappointed
because J.H. had not changed since their initial meeting.

            Rodriguez
stated that J.H.’s symptoms and circumstances required hospitalization.  In his opinion, J.H. suffered from chronic
paranoid schizophrenia, associated with paranoid and grandiose delusions.  Rodriguez believed that if J.H. did not
receive extended treatment at the Hospital that he would likely cause harm to
others.  J.H. stated that he heard voices
and Rodriguez noted that J.H. also had delusions that others were trying to
harm him in a variety of ways.  J.H. told
Rodriguez that other people were bothering him, stating that “sometimes they
pester me.  They beat you down.  They team up with each other.  My mind says I’m gay.”  Rodriguez believed that J.H. was referring to
“hallucinations that tell him that he may be homosexual.”  J.H. also told Rodriguez that 

 

[t]hey say it to
pester my mind. I’m tired of it.  They
try to get me down.  They get into my
personal business.  They reverse the
truth.  They talk about me being a
homosexual in my mind.  They’re plotting
against me.  If they try to do more and I
sneaked out the door, I would blow their heads off.  The ladies put nauseous on my tray.  They always put stuff in the food.  All of this is against my will.  I hear voices.  People can tell what I’m thinking.  I never have peace of mind.  They can put things in my membrane.

 

 

            At
that point, Rodriguez stated that J.H. pointed to the back of his head,
referred to his brain, and continued, stating 

 

I would get a plank
and knock the hell out of the guy when he’s drunk.  They get in my ears and go to town.  If I plug my ears up they say “damn.”  That means they are erasing their mind out of
my ear.  Dr. Thompson sexually abused me
when I was here before.  They want me to
stay here to brutalize somebody.  I could
shoot a man and go about my business.  I
don’t think I could do manslaughter, but I could shoot somebody.

 

 

              Rodriguez is afraid that, because J.H. is
verbalizing ideas of hitting someone over the head with a board, he might
follow up the verbalization of those ideas with action.  J.H. essentially told Rodriguez that he
believed others were trying to harm him, that he felt like a victim, and that
he felt persecuted and paranoid. 
Rodriguez was concerned that J.H. was frightened most of the time,
paranoid, and believed that others were trying to harm him.  J.H. also believed that his food was being
tampered with in some way.  Rodriguez had
to transfer J.H. to a unit for patients who were the most violent and volatile
because he was frightening other patients. 
J.H. was uncomfortable if anyone stood behind him, because he believed
that he was about to be sexually assaulted. 
As a result, he would threaten such persons, stand along the wall, and
glare at people.  Rodriguez stated that
J.H. believed he had resources to purchase food services or buy a car, but he
did not have those resources.  According
to Rodriguez, J.H. might go into society and insist that certain things were
his or that he was entitled to certain things. 
If people react negatively, Rodriguez was not sure how J.H. would
respond.  His greatest concern was that
J.H. was going to misperceive something in the community that would be
interpreted as a personal assault or a physical assault, and at that point “might
take matters into his own hands.”  Rodriguez stated that the intensity of J.H.’s
paranoid delusions concerned him. 
However, he admitted that as recently as February 2006, J.H. had not
engaged in any overt aggressive or assaultive behaviors.  In fact, Rodriguez had no complaint about the
way J.H. interacted with him, noting that he had not been aggressive or
assaultive to him.  He also agreed that
J.H. was not subject to close observation, one to one observation, or two to
one observation. 

            Rodriguez
stated that J.H. engaged in spontaneous rambling, disorganized conversation,
and loose thought associations.  He
stated that J.H. expressed a variety of paranoid delusions, admitted to hearing
voices, and described thought broadcasting and mind control.  Rodriguez explained that thought broadcasting
is a symptom that patients with psychosis experience, believing that other
people in the room can tell what they are thinking and feeling.  Rodriguez stated that, in his opinion, J.H.’s
illness and symptoms of this illness would continue for more than ninety
days.  However, Rodriguez stated that he
remained optimistic that Clozaril would reverse some of these symptoms. 

            Elmer
Stewart, a social worker at the Hospital, testified that he was on J.H.’s
treatment team.  It was the opinion of
the treatment team that due to J.H.’s level of mental illness, he should be
recommitted and his commitment extended. 
Stewart testified that J.H. received court ordered inpatient mental
health treatment at least sixty consecutive days within the twelve months
immediately preceding the trial.  As a
member of the treatment team, Stewart concurred that J.H.’s condition was
likely to continue for more than ninety days. 

            Dr.
Harry Thompson, a staff psychiatrist at the Hospital, testified that he was
J.H.’s treating physician.  According to
Thompson, J.H. had received inpatient mental health services under a court
order pursuant to the Texas Health and Safety Code at least sixty consecutive
days within the last twelve months immediately preceding this hearing.  Thompson believed that J.H.’s condition was
likely to continue for more than ninety days. 
He conducted a medical examination of J.H. on April 25, 2006 and
found him to be suffering from schizophrenia, paranoid type, continuous, with
prominent negative symptoms.  Thompson
explained that the “continuous” portion of his diagnosis had to do with the
sustained longevity of an schizophrenic episode and the fact that J.H.’s
condition has been in existence continuously for months.  “Prominent negative symptoms” include poor
motivation and flattened or blunted affect. 
Thompson also stated that J.H. was taking two medications, Seraquel and
Clozapine.  Thompson believed that J.H.
represented a serious harm to others because he had several delusions, those
delusions were well entrenched, and in those paranoid delusions, J.H.
attributed unintended motives to other people. 
According to Thompson, J.H. made false accusations of other people’s
motives and attributed motives to specific individuals and to the public in
general.  Thompson stated that J.H.
frequently attacked other people, although he admitted that had not occurred
recently.  J.H. would suddenly “blow up,”
hit someone, and make accusations toward them. 
Recently, J.H. threatened the dining room staff because he had delusions
that they were giving him “make-believe” chicken and keeping food away from him
that he was supposed to have.  J.H.
stated that he was supposed to have “roman meal,” apparently a kind of
nutritional package.

            Thompson
stated that one element of J.H.’s psychosis and paranoia was homophobia.  J.H. would not let anyone around him within
society’s comfort zone, and if someone got too close in line to him, he accused
them of having homosexual intent and was frequently aggressive.  J.H. told him that the “Mexican warden is out
to get me.”  J.H. believed that he had a
conflict with a particular warden and that the warden was still negatively
influencing him.  J.H. identified
patients that came and went randomly as the “warden’s agents.”  When J.H. saw the staff rotating, he had the
tendency to identify them as “out to get him.” 
Not only did J.H. have the delusion that the dining room staff was
mistreating him, but he believed they were doing so as a result of being
assigned or planted.  According to Thompson,
part of J.H.’s psychosis was the presence of delusions and his preoccupation
with them. J.H. also had impaired communication in a socially inappropriate
manner.  Thompson believed that J.H.
would approach someone and would very soon be speaking about his delusions or
in a grossly disorganized manner.  In his
opinion, J.H. did not understand that he had a mental illness and lacked
insight, which impaired his ability to function in daily life.  Thompson believed that J.H. would very likely
be rude and quite aggressive in approaching a merchant or a waitress. 

            We
consider J.H.’s threats against the kitchen staff and persons he believed were “against”
him, threats and aggression against those he believed were attempting to
sexually assault him, delusions that others were trying to harm him, and
inability to recognize his mental illnesses to be recent overt acts or a
continuing pattern of behavior that tended to confirm the likelihood of serious
harm to others.  See Tex. Health & Safety Code Ann. §
574.035(e).  Viewing all the evidence in
the light most favorable to the findings, we conclude a reasonable trier of
fact could have formed a firm belief or conviction that J.H. was likely to
cause serious harm to others.  See
id. § 574.035(a), (e); In re J.F.C., 96 S.W.3d at
266.  Therefore, the evidence is legally
sufficient to support the trial court’s order. 
See In re J.F.C., 96 S.W.3d at 266. 

            Having
determined that the evidence is legally sufficient to support the order, we
address factual sufficiency and consider all of the evidence, both that in
support of and contrary to the trial court’s findings.  See In re C.H., 89 S.W.3d at
25.  We note that J.H. was not subject to
close observation by the hospital staff, that he had not been aggressive toward
the physicians or staff, and that he had not been overtly aggressive or
assaultive since February 2006.  However,
the trial court was entitled to disregard evidence contrary to the State’s
position.  See id.  Based upon our review of the record as a
whole, we conclude that, although there is some disputed evidence, this
evidence is not so significant that a reasonable trier of fact could not have
reconciled this evidence in favor of its finding and formed a firm belief or
conviction that J.H. was likely to cause serious harm to others.  See Tex.
Health & Safety Code Ann. § 574.035(a), (e); In re J.F.C.,
96 S.W.3d at 266. Therefore, the evidence is factually sufficient to support
the trial court’s order.  See In re
C.H., 89 S.W.3d at 25.  Having
found the evidence to be legally and factually sufficient to support one of the
jury’s reasons for committing J.H. to the Hospital, we need not consider the
additional criteria used to support his commitment.  See Tex.
Health & Safety Code Ann. § 574.035(a); Tex. R. App. P. 47.1. 
Accordingly, we conclude that the trial court met the obligations
imposed by Section 574.035 of the Texas Health and Safety Code and overrule
J.H.’s first issue.

 

Request for
Disclosure

            In
his second issue, J.H. contends that the trial court erred in allowing the
State to present evidence of acts committed by J.H.  Section 574.007 states that a proposed
patient’s attorney may request information from the county attorney or district
attorney in accordance with this section if the attorney cannot otherwise obtain
the information.  Tex. Health & Safety Code Ann. § 574.007(a) (Vernon
2003).  If the proposed patient’s
attorney requests the information at least forty-eight hours before the time
set for the hearing, the county or district attorney shall provide the proposed
patient’s attorney with a statement that includes

 

(1)           the
provisions of subtitle C, Texas Mental Health Code, that will be relied on at
the hearing to establish that the proposed patient requires court ordered
temporary or extended inpatient mental health services;

(2)           the
reasons voluntary outpatient services are not considered appropriate for the
proposed patient; 

(3)           the
name, address, and telephone number of each witness who may testify at the
hearing;

(4)           a
brief description of the reasons court ordered temporary or extended inpatient
or outpatient,  as appropriate, mental
health services are required; and

(5)           a list
of any acts committed by the proposed patient that the applicant will attempt
to prove at the hearing.

 

Id. § 574.007(b).

            On
April 25, 2006, J.H.’s counsel filed a Request for Disclosure of Information
pursuant to section 574.007 of the Texas Health and Safety Code asking that the
county attorney provide him with all the information described in subsection
(b) of the statute.  Before trial, J.H.’s
counsel stated that he had received no response from the State and, thus,
argued that the State should not be able to present evidence, specifically any
acts committed by J.H. that the State would attempt to prove at trial.  Although J.H.’s counsel acknowledged that
J.H.’s medical records were made available to him, he said had no idea which
acts the State might attempt to prove. 
As a result, he requested the trial court dismiss the case or, as one of
several alternatives, prohibit the State from presenting evidence of any acts
committed by J.H.  

            The
trial court asked the State if it intended “to bring anything that hasn’t been
part of the open medical record, part of the applications on file, part of what’s
the basis of the doctors’ opinions in their certificates, other things that you
think might be a surprise or new to” J.H.’s counsel. The State responded that
it was not going to use “anything that isn’t in this record or on these
certificates or recommendation of the treatment team.” Further, the trial court
asked the State if it intended “to bring up any specific acts, other than what
occurred during the last year.”  The
State replied that it did not.  The trial
court denied J.H.’s counsel’s requests, but limited testimony to specific acts
committed by J.H. not more than one year before trial or any prior hospital
admissions other than the one required for an extended commitment.  As a basis for its ruling, the trial court
stated that the State had adequately shown it was not going to present evidence
beyond what was obvious and open in the record, 
and that the hospital records had been available to J.H.’s counsel for
approximately one month, including the physicians’ certificates and the
recommendation of the treatment team. 
Further, the trial court noted that only when the proposed patient’s
records were not open and available would the statute hold a party to a special
burden, prohibit testimony, or require dismissal of an action. 

            We
review a trial court’s evidentiary rulings for an abuse of discretion.  See Owens-Corning Fiberglas Corp. v. Malone,
972 S.W.2d 35, 43 (Tex. 1998).  A trial
court abuses its discretion when it rules without regard for any guiding rules
or principles.  Id.  An appellate court must uphold the trial
court’s evidentiary ruling if there is any legitimate basis for the
ruling.  Id.  Moreover, we will not reverse a trial court
for an erroneous evidentiary ruling unless the error probably caused the rendition
of an improper judgement.  Id.  The trial court based its ruling on section
574.007(a) of the Texas Health and Safety Code and determined that J.H.’s
counsel should have been able to obtain the information contemplated by the
statute from J.H.’s hospital records, which were provided to him approximately
one month before trial.  The record
confirms the trial court’s finding. 
Therefore, the trial court did not err in refusing to exclude evidence
of acts committed by J.H.  Thus, we
overrule J.H.’s second issue.

 

Psychoactive
Medication Order

            In
his third issue, J.H. contends that the trial court erred in granting the State’s
application for an order to administer psychoactive medication because it was
not based on a valid order for extended inpatient mental health services.  A trial court may issue an order authorizing
the administration of one or more classes of psychoactive medications to a
patient who is under a court order to receive inpatient mental health
services.  Tex. Health & Safety Code Ann. § 574.106(a) (Vernon Supp.
2006).  We have held that the order for
extended mental health services was valid. 
Because the order for extended inpatient mental health services was valid,
we overrule J.H.’s third issue.

 

Disposition

            The
judgment of the trial court is affirmed.

 

                                                                                                    SAM GRIFFITH   

                                                                                                               Justice

 

Opinion
delivered August 30, 2007.

Panel
consisted of Worthen, C.J., Griffith, J., and Hoyle, J.

 

 

 

 

 

(PUBLISH)











[1]
Fazaclo is an antipsychotic medication and is also referred to as Clozapine and
Clozaril.  See http:\\www.drugs.com\fazaclo.html.